## Case No. 14,807.

UNITED STATES v. CLARK.

[1 Paine, 629.] [1]

Circuit Court, D. New York. Oct. Term, 1826.

UNITED STATES—PRIORITY—ASSIGNMENTS—INSOLVENCY — NOTICE — PRINCIPAL AND SURETY—ASSUMPSIT.

1. An assignment under the act of congress of 1797 [1 Stat. 512], to entitle the United States to their priority, must be an assignment of all the debtor's property; that is, the assignment must be a general one as opposed to a partial assignment, or an assignment professedly of a part only of the debtor's property.

[Cited in U. S. v. Langton, Case No. 15,560; Allen v. U. S., 17 Wall. (84 U. S.) 209.]

[Cited in King v. McGilliard, 76 Ind. 31; Mussey v. Noyes, 26 Vt. 474.]

2. Where there is an omission of an article of property in an assignment which purports to be general, but which does not show that the intention was that the assignment should be a partial as opposed to a general one, it does not take the case out of the act.

[Cited in Winner v. Hoyt, 66 Wis. 247, 28 N. W. 390.]

3. If the assignment does not on its face appear to be general, the onus probandi is on the United States.

2 [From 4 N. B. R. 59 (Quarto, 14).]
1 [Reported by Elijah Paine, Jr., Esq.]

4. The priority of the United States does not attach by the mere concealment of their debtor while insolvent. The "legal bankruptcy" mentioned in the act applies only to cases of legal insolvency, where by operation of law the debtor's property is taken out of his hands to be distributed by others.

[Cited in U. S. v. Wilkinson, Case No. 16,695.]

5. An assignee is not liable under the act until notice of the debt due the United States. But the notice need not be given by the United States, nor is a judgment or suit against him necessary in order to charge him with notice. The notice must be such as is required in ordinary cases of trustees, and enough to put a prudent man on inquiry.

[Cited in U. S. v. Eggleston, Case No. 15,027.]

6. Where the debtor, at the time of making the assignment, informed the assignee that he was surety on a bond to the United States, and that he believed the bond was broken, it was held sufficient notice to the assignee.

7. The bond on which he was such surety was a paymaster's bond, conditioned that the latter should well and truly account for and pay over all monies received by him as such paymaster. Held, that the debt of the paymaster to the United States was created by the advances made to him, and not at the time of striking a balance of account against him on the treasury books; and that the surety became a debtor as soon as the paymaster failed to account according to law.

8. And it was held, that it was not necessary that the debt of the surety should be ascertained by a judgment against him in order to make the assignee chargeable with its payment; but that the latter might in the action against himself have the benefit of any reduction to which the surety was entitled.

9. Where the United States are entitled to a priority, they can bring an action of assumpsit against the assignee for monies received by him under the assignment.

10. The article omitted in the assignment was a debt from the assignee to the debtor of the United States, growing out of a previous partnership between them. After the making of the assignment the assignee gave the debtor his bond for the debt. Held, that if the bond was given for monies of the debtor in the assignee's hands at the making of the assignment, the amount might be recovered in assumpsit, but not if it grew out of unsettled partnership concerns.

11. Where assumpsit is brought against an assignee, and he has funds which cannot be reached by the action, it seems that he is not entitled to a deduction for his expenses incurred in the preservation of the property, and the execution of his trust.

12. Where a part of the assigned property had been sold at auction under the direction of the assignee, it was held enough prima facie to show that he had received the price for which it was sold.

This was an action of assumpsit for money had and received, to recover of the defendant [Daniel P. Clark] certain funds of Gilbert Stuart, a debtor of the United States, which had come to the hands of the defendant; the United States claiming the funds by virtue of the priority given by the fifth section of the act of March 3, 1797. The defendant pleaded the general issue.

Gilbert Stuart and another became sureties on a bond to the United States, with Joseph B. Stuart, the principal, a paymaster in the army, on the 10th of July, 1813. The bond was joint and several, in the penalty of

$7,000, conditioned, that the said Joseph B. Stuart, the paymaster, should faithfully perform the duties of paymaster of the —— regiment, and should account for and pay all monies which should come to his hands as such paymaster. By transcripts from the treasury department, it appeared that the paymaster's account was dated December 20, 1819, and a balance of $18.000 and upwards was then due by him to the United States. All the items both of charge and credit were prior to the 15th June, 1815. On the 28th of August, 1819, Gilbert Stuart kept concealed to avoid arrest by his creditors, being deeply insolvent. On the said 28th of August, 1819, Gilbert Stuart being thus insolvent, made an assignment of his property to the defendant and John Stuart, Jr., providing for all his creditors to be paid according to certain priorities. The schedules containing the specification of the property conveyed, were entitled: "Of the Real Property of Gilbert Stuart;" "Of the Personal Property of Gilbert;" "Bonds and Mortgages of Gilbert Stuart;" "Notes and Accounts of Gilbert Stuart;" "Contracts for Sales of Lands of Gilbert Stuart." The schedules contained a minute detail of all the property. A notice was advertised immediately after the assignment, stating, that Gilbert Stuart had assigned his real and personal estate to John Stuart, Jr., and Daniel P. Clark, for payment of his debts, according to the terms of the assignment. At the time the assignment was made, it was declared by Gilbert Stuart to John Stuart, Jr., that it was to contain all his property, and after the execution of it that it did so contain. Within a few days before the assignment, John Stuart, Jr., asked the defendant Clark, the other assignee, if he did not owe Gilbert Stuart, to which he answered, "No, not a dollar." Gilbert Stuart declared the same thing. On the 20th of September, 1819, a settlement took place of certain previous concerns between the defendant and Gilbert Stuart, growing out of a partnership between them, which had ceased long before, the funds of which had been used by defendant in his own business; and on that settlement the sum of $7,400 was found due by defendant to Gilbert Stuart, for which he gave his bond. This bond was afterwards reduced by payments to Gilbert Stuart by the defendant, and allowances by the former to the latter, to $3,000, in April, 1820. On this last settlement the bond for $7,400 was given up, and a new obligation given by defendant to Gilbert Stuart for $3,000, in which he had, however, inserted as a condition, that he was to be indemnified against his liability to the creditors under the assignment, for a certain sale to one Joanna Stuart, of furniture of Gilbert Stuart, comprised in the assignment. The whole amount of property proved to be sold was, furniture $2,556. A further sum of $90 was received by defendant. In May, 1821, suit was brought by the United States on the bond against Gilbert Stuart, and judgment rendered in the same month for the amount of the bond. It appeared, that at the time the assignment was made, on the 28th of August, 1819, Gilbert Stuart informed the defendant of the bond to the United States, but told him that he. Gilbert Stuart, was not liable, because he had not been duly notified of the default of Joseph B. Stuart. It further appeared, that on the 20th of September, 1819, the date of the first settlement, the defendant knew of the bond and of the default of Joseph B. Stuart, but thought Gilbert Stuart not liable.

R. Tillotson, Dist. Atty., S. A. Foote, and D. Lord, for plaintiffs, contended:

That by the indebtedness of Joseph B. Stuart, all accruing before the 15th of June, 1815, the condition of the bond was broken, and Gilbert Stuart was a debtor to the United States, within the meaning of the act, on and before the 28th of August, 1819. That by the concealment of Gilbert Stuart, he being insolvent, an act of legal bankruptcy had been committed within the act of congress of March 3, 1797, which entitled the United States to a priority of payment out of Gilbert Stuart's estate. That the assignment of the 28th of August, 1819, was an assignment by the debtor, Gilbert Stuart, of all his property within the meaning of the same act. That the debt of $7,400 having been left out of the assignment through mistake or fraud, or not then being ascertained, this circumstance did not prevent the assignment from being a general one, within the meaning of the law. That an action for money had and received would lie, for the proceeds of the assigned property, and also for the amount of the reserved debt, on which the priority was alleged to have attached on the 28th of August, 1819. That no payments after the 28th of August, 1819, or at farthest after the 20th September, 1819, should be allowed to defendant.

T. A. Emmet and R. Emmet, for defendant, contended:

That the condition of the bond not being for the payment of a specific sum of money, the indebtedness of Gilbert Stuart as surety, did not arise until the extent of his liability was ascertained and defined by a judgment on the bond, or, at least, until the commencement of a suit upon it; and at all events, that no such indebtedness could have arisen or existed in law prior to the settlement of the paymaster's accounts in December, 1819. That the defendant, as assignee of the surety, could not be charged with notice, nor had the plaintiffs a right to inquire into his acts as assignee previous to the legal existence of the surety's indebtedness to them. That the defendant's knowledge of the paymaster's default, at the time of the assignment, was not sufficiently proved, and even if it had been, that such knowledge and the knowledge of Gilbert Stuart's suretyship, could not

bind him, prior to a judgment against Gilbert Stuart as such surety, inasmuch as Gilbert Stuart might have had a good defence, which would have discharged him in an action brought against him as surety. That the assignment was not an assignment of all the debtor's property within the meaning of the law, and even if it were so, that the totality of the assignment and the keeping concealed to avoid arrest, were not circumstances of which the United States could avail themselves to create their priority, unless there was an ascertained and strictly legal indebtedness by Gilbert Stuart to them at the time, which could not be the fact, as the paymaster's accounts were not even finally made up, and his defalcation ascertained, until after Gilbert Stuart had made his assignment and kept himself concealed. That even if the priority of the United States did attach from those circumstances, they had no right to enforce it by an action against the defendant. That the act of 1797, under which the United States claimed priority in this case, creates no personal responsibility of an assignee, nor gives any right of action against him, while the act of 1799 [1 Stat. 627], giving a like priority in cases of debt for duties, expressly declares that an assignee who shall pay a debt due to another, before the debt for duties to the United States has been paid, shall be answerable in his own person and estate, and that the use of such express words of liability in the latter act, and the omission to use them in the former, shows, that such personal liability of an assignee, to be enforced by an action at law, was not contemplated nor intended in cases like the present. That a preference only being acquired by the act of 1797, the United States must resort to the same mode of proceeding that any common creditor would have to pursue, to get at the property of a debtor, viz. by obtaining a judgment against such debtor, and issuing execution; and in case such judgment and execution should prove ineffectual, owing to an assignment made by the debtor, then by filing a bill in equity against the proper parties, to compel a discovery and production of the property, and to establish their preference in the distribution of it. That in any case an action for money had and received would not lie against an assignee by a creditor not claiming under the assignment, and that for want of such privity between the United States and the defendant it could not be maintained in the present case. That even if the action would lie, it would only be to recover such money as the plaintiff could prove to have been actually in the hands of the defendant as assignee when the suit was brought, but not to make the defendant accountable for any monies which he might have received and paid to other creditors, even although such payments had been made by him with full knowledge of the preference claimed by the United States. That the defendant was at all events entitled to be allowed for all payments made by him before he had notice of the debt due by Gilbert Stuart to the United States, and of its ascertained amount, and that such notice must have been given expressly by the United States themselves.

THOMPSON, Circuit Justice (charging jury). Some observations have been made to you, in relation to the act of congress under which the United States claim a preference over other creditors of Gilbert Stuart, which are calculated to divert your attention from the matters proper to be submitted to you. It has been treated as a harsh and severe law, and one that is not entitled to the favourable consideration of the court and jury. With the policy or fitness of this law, we have no concern; it is a valid and constitutional law, and has been so adjudged by the highest tribunal of the country. It is, therefore, binding and obligatory upon us; and must govern the rights of the parties in this case, so far as the question of preference is concerned. Most of the questions which have been agitated in the course of the trial are questions of law, upon which I have already intimated an opinion; but to which exceptions have been taken, and to enable the parties to avail themselves of such exceptions, it may be proper for me again to notice the various questions that have arisen.

The first inquiry is, whether Gilbert Stuart was a debtor to the United States, within the meaning of the act of 1797 (2 Bior. & D. Laws, 595 [1 Stat. 515]), and at what time he became so indebted. The language of the act is very broad, and applies to all persons thereafter becoming indebted to the United States by bond or otherwise. It appears that on the 10th day of July, 1813, Gilbert Stuart and Moses Willard became bound with Joseph B. Stuart to the United States by a bond in the penalty of $7,000; conditioned, that Joseph B. Stuart should perform the duty of paymaster in the —— regiment of the ——, and well and truly account for, and pay over all such monies as should be received by him as such paymaster.

It is contended on the part of the defendant, that Gilbert Stuart did not become a debtor to the United States, until judgment was recovered against him on this bond; or at all events not until suit brought. This I think is not a correct view of the law. Gilbert Stuart became a debtor to the United States whenever the condition of the bond was broken. The condition of the bond is not to account when called on, but well and faithfully to account; that is, to account according to law, and to pay over the balance. Joseph B. Stuart was bound according to law to account every three months; and it appears by the abstracts from the treasury books, that all the charges and credits to Joseph B. Stuart are prior to 15th of June, 1815. At that time, a balance of more than the amount of the bond appeared due by Joseph

B. Stuart, as paymaster, to the United States.

It is urged. however, that no balance was struck against him until 29th December, 1819. and that the debt of Joseph B. Stuart did not accrue till then. But this cannot be so considered. The striking the balance on the treasury books, does not in any sense create the debt, it only ascertains the amount due. The debt is created by the advances made, and Joseph B. Stuart was as much a debtor before the balance was struck as afterwards. The last credit given him was on the 15th of June, 1815, and whatever amount the treasury books then showed due from him, was the debt due, and which he was bound to pay; and not having been paid or accounted for in any manner, the bond became forfeited, both as to the principal and his sureties; and Gilbert Stuart from that time became a debtor to the United States.

But it has been contended, that admitting the priority exists, still no right of action at law accrues to the United States; and on this subject a distinction has been attempted to be drawn between the act of 1797. and the duty act of 1799. The act of 1799 is confined to bonds given to secure duties and has no concern with the act of 1797, and is not to affect the construction of it. It is said that by the act of 1797, the United States acquire merely a preference, and that this preference is to be exercised through a judgment and execution, and not by any action at law. This construction would render the act nugatory. It has been settled that the priority does not give a lien to the United States; that it does not overreach bona fide purchasers; and therefore the property would seldom be reached by an execution. This therefore cannot be the manner of enforcing the priority. The act not having prescribed the mode. it is left to the ordinary rules of law to carry the priority into effect, according to the circumstances under which it is sought. If the United States needed the aid of a court of equity, they could file their bill, as in compelling the execution of a trust; but if circumstances are not such as to require the interposition of a court of equity, then the United States are not obliged to go there.

Suppose the defendant is proved to have received the whole amount of the bond in cash from Gilbert Stuart at the time of the assignment, would the United States be driven into a court of equity to recover it? Would not an action for money had and received lie in such a cause? The case is the same, if such a state of facts exists here as shows that the defendant has received money of Gilbert Stuart's estate, under the assignment. If a trustee has received money out of his trust estate which he is bound to pay over to a creditor, that creditor may maintain this form of action and may sue at law. If questions arise as to the rate of distribution among a number of creditors entitled to a portion of the insolvent's estate, then the aid of a court of chancery may be necessary. But here the United States have an exclusive right, and are entitled to full satisfaction. Of course. a resort to a court of equity to settle the distribution of the funds cannot be necessary; and if the jury are satisfied that the defendant has received the money in contemplation of law, then there is no need of resort to a court of equity, and this form of action at law is maintainable.

The next point to be considered is, whether such a state of facts existed in this case that the priority of the United States attaches. It has been contended on the part of the plaintiffs, that the concealment of Gilbert Stuart to avoid arrest by creditors, was an act of legal bankruptcy, and that this act alone gives the right of priority to the United States. There is in this part of the law some little obscurity. The general object of the act is to give a preference to the United States. This presupposes a distribution of the debtor's property. The idea of preference is inapplicable while the property remains in the hands of the debtor and subject to his control. How could such a preference be enforced? Only by the ordinary course of a suit against the debtor and execution thereon, all of which exists by the ordinary course of law, and supposes no preference. A preference necessarily implies that the property is put out of the control of the debtor and to be distributed by others or by operation of law. A mere insolvency so long as the debtor retains the management and control of his property, does not allow of the application of the law. The act looks to a legal insolvency, where the property is taken up by the law for distribution among the creditors of the debtor. There is no difficulty in the construction of the act until we arrive at the last phrase "legal bankruptcy." What is "legal bankruptcy"? In 1797, when the act of congress was passed, we had no bankrupt law; and therefore these words can have no reference to bankruptcy under a bankrupt law. The words seem in their connexion to have reference to the previous cases put in the section, and to point out some legal insolvency or some mode of proceeding by which the property of the debtor is taken out of his hands and to be distributed by others.

I know of no mode of enforcing a preference while the debtor is going on in the management of his own affairs; the only mode of proceeding in such a case is, to commence a suit against the debtor and go on to judgment and execution in the ordinary way. The concealment. therefore, of itself, would not be such a circumstance as to make the act apply and give rise to. the attaching of the priority of the United States. if Gilbert Stuart had remained in the possession and management of his property. But in this case there has been a voluntary assignment by the debtor of his property, on the 28th August, 1819, within the meaning of the law. The supreme cour

of the United States have decided, that the assignment must be of all the debtor's property: by which I understand, that it must be an assignment of all, as contradistinguished from a partial assignment, or professedly an assignment of part only of the debtor's property. The case put of a fraudulent omission of a part is not the only exception, but is mentioned by way of illustration. Where an assignment purports to be general, and is understood and intended so to be, the omission of a trifling article through mistake or accident, would not surely take the case out of the act. This would be inadmissible on every sound principle of construction. The true distinction is that which has already been suggested: that where the omission does not show that the intention was that the assignment should be a partial one as opposed to a general one, the act applies, and the priority of the United States attaches. Here the assignment purports on the face of it to be a general one. The schedules are headed "Of the Real Property"—"Of the Personal Property." The vouchers for his debts and all the various descriptions of property of Gilbert Stuart are set out with every possible particularity. If the assignment does not on its face appear to be general, the onus probandi lies certainly on the United States. But here they have proved the generality of the assignment in the most satisfactory manner. When the assignment was executed, it was given out by the parties to be general. It was understood by John Stuart, Jr., the other assignee, and so declared by Gilbert Stuart, that all his property was to be included. John Stuart, Jr., tells him that all his property must be included. Gilbert Stuart says that he has done so. The defendant, immediately previous to the assignment, tells John Stuart, Jr., that he does not owe Gilbert Stuart a dollar.

The defendant is concluded by all this from now disputing the generality of the assignment, and setting up the omission of the $7,400, which he has since acknowledged he owed Gilbert Stuart at the time of the assignment, for the purpose of defeating the priority of the United States. If this debt was reserved by fraud, then the priority is not defeated; if, because it was not deemed a legal debt, but only an honorary one, or was omitted by mistake, then also the priority attached; and in either case the omission of this debt is no objection to the right of priority on this ground. The right of priority, therefore, is put on the ground that this is a general assignment. As to the insolvency of Gilbert Stuart at the date of the assignment, it is abundantly proved, and is not in fact disputed.

When then did this priority take effect, as regards the present defendant? It has been contended on his part, that it takes effect only on obtaining judgment against himself, or at most, from the time of suit brought

against him. As to this point, the act is entirely silent. It is to be put, therefore, on the general principles of law relative to the liability of trustees. They are not liable until notice. And if there had been no notice until after the bringing of this suit, the defendant would not, in this action, have been liable at all. Had then the defendant that notice of the debt of Gilbert Stuart to the United States which would charge him, and when had he such notice? In all cases of this kind, to protect a trustee, he must act bona fide in disposing of the property; and when such circumstances come to his knowledge, as should reasonably put a prudent man on inquiry, this is all the notice which is required. It has been said here that no notice would be available unless it came from the United States, they being the creditors. This is not correct. It is enough if the trustee be in possession of such facts as that a faithful and fair discharge of his duty would put him on inquiry.

It appears in evidence, that at the time of the assignment, the defendant was informed by Gilbert Stuart that he was surety for Joseph B. Stuart in a bond to the United States, and that he believed the bond was broken. This was sufficient notice, and he is from that time chargeable with the duty which the law imposed on him, to give a preference to the United States in the distribution of Gilbert Stuart's property. It was his duty to make inquiry at the proper office, to see what the debt was, and to pay it. It has been said that this would be imposing on the defendant great risk and hardship; that if he had been called into a court of chancery by the creditors, provided for in the assignment, he would not have been excused by reason of this bond, from accounting for all the funds he had in his hands. But this I apprehend is a mistake. The defendant would by presenting the circumstances before the court of chancery, have been protected by it until the actual amount of the debt could have been ascertained and paid. He was in this respect in no jeopardy. As to the objection urged on behalf of the defendant, that until judgment against Gilbert Stuart the surety, the defendant could not know the amount for which Gilbert Stuart would be liable, as the amount might be reduced by Gilbert Stuart on the trial; the defendant in this action may now have the same benefit. He might, if he could, show the debt of the United States reduced to any extent, in the same manner as Gilbert Stuart could have done in the action against him.

The amount of the recovery is a question resting with you, under the rules of law heretofore stated, and such as may be hereafter laid down. The liability of the defendant to the priority of the United States arose, as I have already decided, at the time he had notice of Gilbert Stuart's debt; and such notice was given at the time the assignment

was made. He was therefore from that time bound to apply to the debt of the United States the whole of what he should receive under the assignment, until the debt was paid. He was bound to pay the proceeds of the assigned property as the law directs. He comes under this obligation by assuming the trust, and is legally bound to pay over the money he receives to those by law entitled to it. In the present case the United States were so entitled. Whenever the money was received by the defendant, he received it to the use of the United States. This being an action for money had and received, it is necessary for the plaintiffs to show that the defendant has in fact received money to which they are entitled, or such facts must be proved as to afford a fair and reasonable presumption that money has been received. From the evidence in this case it appears, that certain furniture which had been assigned by Gilbert Stuart to the defendant, was sold under his direction, at public auction, for $2,356; and it is not unreasonable to presume, that he has received the money. It is at least enough, prima facie, and throws on the defendant the burthen of rebutting this presumption, by proof on his part. And unless he has done so to your satisfaction, that amount, deducting the commissions and auction duties, is recoverable in this action.

With respect to a part of this money, the proof is very satisfactory, that it has in fact been received by the defendant; and he has also had credit upon his bond to Gilbert Stuart for another part. Whatever you think the evidence will warrant you in concluding that he has received, or had the benefit of in paying his own debt, he is responsible for. The defendant claims that he is entitled to a deduction of $621, for expenses incurred by him in the preservation of the property assigned to him, and in the discharge of his trust, and this seems to have been conceded on the part of the plaintiff. Had it not been, I should entertain some doubt whether he was entitled to such deduction. If the recovery in this case could reach all the proceeds of the assigned property, it would seem reasonable that the expenses necessarily incurred in and about the preservation of the property should be first paid, and perhaps the priority of the United States would not overreach such expenses. But as it appears that the defendant has funds that cannot be reached in this action, I should have inclined to the opinion, that the expenses incurred in the execution of the trust, should fall on such funds. If, however, this is yielded on the part of the plaintiff, you can make the deduction.

It is claimed, on the part of the United States, that they have a right to receive the full amount of their debt out of the bond given by the defendant to Gilbert Stuart in September, 1819, for $7,400. Whether the defendant in this action, for money had and received, can be made responsible for any part of this bond, is a question by no means free from difficulty. The circumstances in relation to this bond are involved in considerable obscurity. Whether it was given for a real debt due from the defendant to Gilbert Stuart, may be doubtful from the evidence. If given for such debt, it is a part of the trust fund, and for which the defendant might be made accountable in equity: Whether in this action, or not, will depend on the question, whether it was given for money which the defendant had in his hands at the time of the assignment, belonging to the estate of Gilbert Stuart, or whether it grew out of some unsettled partnership concerns. If the latter, I should think it could not be reached in the present action. Of this you will judge from the evidence, and render your verdict accordingly.

The jury found a verdict for plaintiffs for $1,760.81.